IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2020

**IN RE KATELYNN S. ET AL.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT250133        Sheila Calloway, Judge**
_____

**No. M2020-00606-COA-R3-PT**
_____

The Tennessee Department of Children's Services filed a petition to terminate a mother's parental rights based on abandonment by failure to provide a suitable home; substantial noncompliance with permanency plans; failure to remedy persistent conditions; and failure to manifest an ability and willingness to assume custody of the child. The trial court granted the petition, finding that the Department proved all alleged grounds by clear and convincing evidence and that terminating the mother's parental rights was in the best interests of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Amber S.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND**

Amber S. ("Mother")[1] gave birth to Jordan S. in August 2006 and to Jayce R. in May 2012.[2] Jordan's father is deceased, and Jayce's father is currently incarcerated.

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of parties and witnesses, as appropriate.
[2] Although this action is styled *In re Katelynn S. et al.*, Katelynn S. is not at issue in this appeal.

Mother's interactions with the Tennessee Department of Children's Services ("the Department" or "DCS") date back to at least 2014. In August of that year, the Department received a referral concerning Mother for lack of supervision of Jordan and Jayce ("the Children") and their two older siblings. In April 2015, the Davidson County Juvenile Court ("the trial court") entered an agreed order adjudicating the Children and their siblings dependent and neglected by Mother based on her lack of supervision and prescription drug abuse. Legal custody of the Children remained with Mother, but the Children were placed with their maternal grandmother under an Immediate Protection Agreement.

On May 11, 2016, DCS filed an emergency petition to adjudicate the Children dependent and neglected. The petition followed an April 2016 referral alleging that Mother had exposed the Children to drugs. During the investigation, Mother tested positive for cocaine and methadone. The trial court ordered that the Children remain with their maternal grandmother to allow Mother to address her substance abuse issues, with the condition that Mother would not be allowed unsupervised contact with the Children.

On August 11, 2017, following a motion for emergency review filed by DCS, the trial court adjudicated the Children dependent and neglected and placed them under the Department's custody, finding that the case manager had been unable to contact the Children since April 2017 and that the Children had "possibly been exposed to illegal drugs as well as tuberculosis, and should be tested accordingly." The trial court also found that the Children's maternal grandmother had "given deceptive/untrue information in an apparent attempt to prevent DCS and the court from locating the children." The Children have remained in foster homes continuously since their removal and were initially placed with the M. Family from October 2018 to April 2019. In April 2019, the Children were placed in separate homes, as recommended by their counselors, but have maintained contact with each other through phone calls and monthly visits.

On January 29, 2018, the trial court ratified an initial family permanency plan, dated September 6, 2017. The permanency plan had the goal of "return to parent or exit with kin/relative" and listed the following issues: Mother's drug use, parenting skills, and mental health, as well as children's truancy and medical neglect. The plan had an expected "achievement date" of August 2018 and required Mother to: (1) complete and follow recommendations of an alcohol and drug assessment and sign a release of information of the assessment to DCS, her attorney, and the guardian ad litem; (2) submit to random drug screens; (3) complete and follow recommendations of a mental health assessment and sign a release of information of the assessment to DCS, her attorney, and the guardian ad litem; (4) complete and follow recommendations of parenting assessments; (5) obtain and maintain income and stable housing; (6) maintain a minimum of four hours per month of in-person supervised visitation with the Children; and (7) maintain regular contact with

DCS.[3]  In January 2019, the trial court set Mother's support for the Children at $107.00 per month per child to commence on February 1, 2019.

On June 19, 2019, DCS filed in the trial court a petition to terminate the parental rights of Mother and Jayce's father with respect to the Children.[4]  As to Mother, the petition alleged four grounds for termination: (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistent conditions preventing return of the Children; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility of the Children.  The petition also alleged that terminating Mother's parental rights was in the Children's best interests.  The trial court appointed a guardian ad litem for the Children and counsel for Mother.

On August 14, 2019, after an evidentiary hearing on an emergency motion filed by the guardian ad litem, the trial court entered an order suspending Mother's visitation and telephonic communication with the Children.  The motion had been prompted by an incident in March 2019 during which Mother attended Jordan's basketball championship game while under the influence of drugs.  The trial court's order suspending visitation noted that Mother had tested positive for drugs twice earlier in the year.

The trial court heard DCS's petition for termination on February 5, 6, 11, and 12, 2020.  The Department called as witnesses DCS caseworkers Brittney Easley and Rachel Teeters and foster parents Dana N. and Jessica T.  Mother testified on her own behalf and presented the testimony of Christy Shaw, caseworker with social services agency Monroe Harding, and Rhonda Pendergrass, Jayce's mental health counselor.

Ms. Easley was the assigned caseworker from the time the Children came into DCS custody in August 2017 until Ms. Teeters took over the case in June 2018.  Ms. Easley stated that Jordan tested positive for marijuana upon being brought into custody.  She stated that Mother was compliant with the permanency plan "early on like from August until say December of 2017."  Ms. Easley said that Mother was already receiving survivor's social security income from Jordan's deceased father and counseling through Behavioral Health Group ("BHG").  She began conducting drug screens of Mother after learning that the screens given by BHG were not random.  Mother tested positive for marijuana one time and negative on a different occasion.  Ms. Easley took the Children to Mother's home for visits and said most visits went smoothly.  Sometimes, however, Mother did not show for scheduled visits or left before the visits were over.  Ms. Easley observed that although Mother would promise the Children that they would be reunified, she had a pattern of disappearing "for a little while" before remerging to "demand visits with the children."

___

[3] Subsequent permanency plans dated March 23, 2018 and August 1, 2018, respectively had the same requirements and were ratified by the trial court.

[4] Jayce's father is not a party to this appeal.  We will reference him only as needed for context.

Ms. Easley arranged for Youth Villages Services to provide at-home parenting education for Mother, but the classes were terminated because of Mother's noncompliance. Although Mother later completed a parenting assessment in December 2017, Ms. Easley testified that the lack of success with parenting training impacted the Department's ability to return the Children to Mother and to change Mother's visitation from supervised to unsupervised.

Ms. Teeters testified that she was responsible for the Children's case from June 2018 to October 2019. She corroborated Ms. Easley's testimony that the Department began screening Mother after discovering that the drug screens provided by BHG were not random. Ms. Teeters said that Mother was doing well until she tested positive for methamphetamine and amphetamines in January 2019 and that Mother admitted to her that she had used drugs over the Christmas holiday. She verified that Mother began working in March or April 2019. According to Ms. Teeters, Mother did not visit the Children in February 2019 and visited maybe once in March 2019. That same month, Ms. Teeters explained, Jordan had a basketball championship game, which Jayce, the M. Family, Ms. Teeters, and Jordan's therapist attended. Mother arrived a couple of hours late, appeared disoriented, and was "going in and out." She "made a really big scene to the point where we had to have visits suspended." Ms. Teeters said that at the game, Mother initially refused to submit to a drug screen but later had an oral swab that tested positive for methamphetamine and ethanol. Jordan's demeanor on the basketball court changed, and he became "extremely anxious, like fidgeting, touching his face." The guardian ad litem filed a petition to suspend visitation, which the trial court granted. Although Mother could regain visitation by obtaining alcohol and drug and mental health assessments, as outlined in the permanency plan, Mother had not complied with those tasks by the time Ms. Teeters was off the case in October 2019. Ms. Teeters added that Mother tested positive for cocaine after a drug screening in June or July 2019. Mother did not have a mental health assessment while Ms. Teeters was on the case. Ms. Teeters admitted that she did not set up a mental health assessment for Mother. She said her focus was to assist Mother with completing an alcohol and drug assessment and reaching unsupervised visitation, and she did not want to "press everything at once."

In Ms. Teeter's view, the Children seemed to have a bond with Mother during her visits in Fall 2018, but "it's hard to say whether the bond is still there." During Ms. Teeters' time with the case, Mother was not able to progress from supervised to unsupervised visitation and did not attend Individualized Education Plan ("IEP") meetings for Jordan or Centers of Excellence ("COE") meetings concerning Jayce's therapy. Mother, said Ms. Teeters, "couldn't see her children's behaviors as problems." In addition, Ms. Teeters observed a constant string of multiple adults going in and out of Mother's home, an issue that played a role in the Children's initial removal. Mother always denied that these individuals were staying at the home but did not provide Ms. Teeters with information she requested about them. Ms. Teeters explained that DCS was concerned with Mother's ability to supervise the children and had concerns about her home environment and her

drug use. She said that although Mother tried to visit the Children, buy them gifts, and complete some assessments, there is little likelihood that these conditions will be remedied at an early date.

Ms. Teeters also testified about the Children's challenges and progress. She said they have received counseling for trauma since they came into the Department's custody. Jayce told Ms. Teeters that when the police came to her home, she was told to hide along with other people in the crawl space of the home. Jayce, who was seven at the time of trial, still wets herself at night, has "issues touching herself, " and "knows a lot about that world of sex." DCS attempted to keep the Children together, but they were placed separately in April 2019 because "they disrupted [joint] placements multiple times" and "blamed each other for a lot of what's happened to them." Jordan was placed with Dana N. and Jayce with Jessica T. and her family. The foster parents participate consistently in the IEP and COE meetings. Ms. Teeters stated that the Children "are the most stable they've ever been, and they're doing the best that they've ever been doing that I've known them . . . I think that the best is for them to stay where they are and to be adopted."

Ms. Teeters expressed that when she first took the case, she had high hopes because Mother had "done a lot of things and she's made a lot of effort." However, she said, "the reality is we're sitting here at two-and-a-half years, and it's just this long, drawn out story of ups and downs and not being able to show that sobriety and stability long term." Ms. Teeters summarized, "I've seen [Mother] make serious progress and then fall short, and make serious progress and then fall off." She remained concerned about Mother relapsing, not providing supervision, and having strangers living in the home.

Ms. N. became Jordan's foster mother in April 2019. She is a single foster mother; only Ms. N. and Jordan live in her household. She said that although Jordan is doing well in the eighth grade, he still has a fourth or fifth grade reading level. He plays football, basketball, and baseball. Jordan is receiving needed services but struggles with shutting down when he gets frustrated. Recently, he has progressed to talk with Ms. N. about "stuff that's going on at school" and the break up with his girlfriend. According to Ms. N., she has texted Mother at least once a week since November 2019, sending her photos of Jordan's activities. Mother texts back but does not ask about how Jordan is doing in school or in therapy. Mother has sent gifts for Jordan, but often they were not the proper size or items that he wanted or requested. Ms. N. maintains regular contact with Jayce's foster mother, Ms. T, and they coordinate sibling visits. Ms. N. said that she loves Jordan and would like to adopt him given the opportunity.

Ms. T. has been Jayce's foster mother since April 2019. She is a therapist and lives with her husband and their two biological daughters. Ms. T. said Jayce has become their "middle" daughter. Jayce is doing well academically but sometimes struggles with peer relationships and has bullied other children. Jayce goes to counseling on a weekly basis

and enjoys it. Ms. T. confirmed that Jayce still wets the bed, wears a pull-up every night, and is, at times, "very hypersexual . . . and . . . dance[s] very inappropriate[ly] for a seven-year-old." Jayce has told Ms. T. that when the police came to her home, Mother and her older sisters would tell her to "be very quiet or the police will take you away." Ms. T. did not have direct contact with Mother but sent her pictures and report cards through Ms. N. She confirmed that Mother has not participated in COE meetings. Like Ms. N., Ms. T. said that Mother sent gifts to Jayce four or five times, including shoes in the incorrect size, crayons or markers, a nightgown not appropriate for a seven-year-old girl, an extra-large men's shirt, coloring books, tampons, and other "odds-and-ends stuff." Ms. T. and her husband have been talking about adopting Jayce. She said she loves Jayce, but she is not sure if she is ready to adopt her given Jayce's ongoing trauma issues.

Mother testified that at the time the Children were placed under the Department's custody, she was living with her boyfriend, the Children, and her other kids at a house owned by her grandmother. She confirmed receiving around $400 per month in social security survivor's benefits from her deceased husband, independent of what Jordan receives. Mother said she was regularly visiting the Children a couple of times a month during the fall of 2017. Concerning her substance abuse, Mother said she began attending BHG for treatment in the fall of 2017 and received sessions with counselors, three to four random drug screens per month, and methadone. Mother said she completed an alcohol and drug assessment, as well as a mental health assessment, in December 2017. She did not think there were any recommendations from the assessments. Mother stated that she has not used cocaine since 2009 or alcohol since 2018; has never used amphetamines or benzodiazepines; and has been on methadone for five years through BHG. She said that BHG will taper off the methadone when she feels "substantially ready." Mother maintained that the 2019 positive screen for cocaine was wrong. Mother also testified, however, that she was using "Roxies" and pain pills in 2015. The record contains court orders stating that Mother admitted using drugs in 2015, tested positive for cocaine in June 2019, and tested positive for amphetamines and methamphetamine in January 2019. Mother said she did not complete a second alcohol and drug assessment until November 2019 because she had just taken a job and could not take leave; she said that assessment did not provide any recommendations. She added that she has been attending NA meetings since the beginning of 2020. Concerning the incident at Jordan's basketball game in March 2019, Mother said that she had taken muscle relaxers and driven three hours from a family funeral to get to there that day. She said that she refused to take a urine test because she had just gone to the bathroom and that the mouth swab came back positive for methamphetamine because of the medicine she was taking. Mother admitted she recalls "very vaguely" Jordan's reaction during the incident.

Mother admitted to having no interaction with the Children's counselors about their emotional and mental health issues. She stated she had a good bond with Jayce and Jordan until her visitation was suspended and that Jordan enjoyed riding ATVs and playing video

games with her. As to Jayce's bed wetting, Mother explained that she and her other daughters also had the same problem until reaching puberty. Mother stated she believes she can take care of the Children. She had worked for Wendy's for about a year and for Dollar Tree for about six months, and she is now able to take time off to complete drug screens and address other items in the permanency plan. Mother emphasized that she had given gifts to the kids through Ms. Shaw, including $100 for Jordan's birthday. She added that no one lives with her now and that she has a driver license, a vehicle, and medical insurance.

Ms. Shaw, caseworker with Monroe Harding, testified that she began working on the Children's case in December 2018. Her role included staying connected with the foster parents, visiting the foster homes, and working with DCS to address the Children's needs. Ms. Shaw said that in early 2019, Mother's visits with the Children were supervised by their foster parents, the M. Family. Mother attended Jordan's basketball practices and Jayce's cheerleading practices and went to church with the M. Family before her visitation was suspended. Mother began contacting Ms. Shaw about twice a month in the fall of 2019 to ask how the Children were doing and if they needed anything. Ms. Shaw did not directly observe interactions between Mother and the Children. She said that the Children seemed happy in their current foster homes and appeared the most stable since she took the case. Ms. Shaw testified that Jordan excels in sports and that Jayce is in dance class, gymnastics, Girl Scouts, and church activities.

Ms. Pendergrass has been Jayce's mental health counselor since April 2019. She testified that Jayce is terrified of police and has been provisionally diagnosed with adjustment disorder with anxiety and depression due to trauma and neglect. When Jayce first came to counseling, she was very anxious about being abandoned and would cling to her foster parents. Jayce also worries about her mom and the people in her family. Jayce told Ms. Pendergrass that she learned behaviors such as lying and stealing from Mother. Ms. Pendergrass confirmed that Jayce displays inappropriate behavior for her age, such as trying "to take her shirt off, [and] putting her hands down her pants . . . in gymnastics meetings." However, Jayce has made "tremendous progress" in therapy, now using words not just gestures to communicate. Ms. Pendergrass emphasized that consistency is very important with trauma victims and noted that Ms. T. has never missed an appointment. Ms. Pendergrass has not interacted with Mother but said that Mother did not show for two scheduled calls. Ms. Pendergrass stated that having contact with Mother would not be beneficial for Jayce; she recommended against phone calls with Mother because they would result in "an emotional roller-coaster, and . . . would probably set [Jayce] back more than move her forward." According to Ms. Pendergrass, Jayce is adjusting well in her current foster home and has reported feeling loved and cared for. She recommended that Jayce remain with Ms. T.: "I think it's gone on too long. That's why I'm really hoping that this home works out, because I think so much of her anxiety is that she's just had so many inconsistent things between being moved and changes for any small child."

On March 20, 2020, the trial court entered a final order terminating Mother's parental rights. The trial court found that there was clear and convincing evidence of the four termination grounds alleged by DCS. After making specific findings as to the nine statutory factors, the trial court also found that terminating Mother's parental rights was in the best interests of the Children. Mother timely appealed.

## ISSUES PRESENTED

We summarize the issues presented by Mother as follows: Whether the trial court erred in concluding that DCS proved by clear and convincing evidence each of the four statutory grounds for termination it alleged and that terminating Mother's parental rights is in the best interests of the Children.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483

S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). Where an issue "hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Id.* (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)); *see also Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) ("If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary.").

## DISCUSSION

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) statutory grounds for termination of parental and guardianship rights have been established, and (2) termination is in the best interests of the child. *See* Tenn. Code Ann. § 36-1-113(c). We begin our analysis by reviewing whether the proof presented at trial constitutes clear and convincing evidence of each ground for termination listed in the trial court's Final Order.

### I.      Grounds for termination

### A.      Abandonment – Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g) lists abandonment, as defined in section 36-1-102, as a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2017 & Supp. 2018). Section 36-1-102 provides that abandonment occurs, among other instances, when

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

*Id.* § 36-1-102(1)(A)(ii)(a)-(c).

- 10 -

To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting a parent to establish a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (citing *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)); s*ee also In re Matthew T.*, 2016 WL 1621076, at *7. Although the parent is required to make "reasonable efforts" to establish a suitable home, "successful results" are not required. *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006).

In the present case, on May 11, 2016, DCS filed an emergency petition to adjudicate the Children dependent and neglected after receiving a referral that Mother had exposed the Children to drugs. The Children were placed with their maternal grandmother to allow Mother to address her substance abuse issues, with the condition that Mother would not have unsupervised contact with the Children. On August 11, 2017, the trial court adjudicated the Children to be dependent and neglected[5] and placed them in the custody of the Department, finding that the case manager—despite repeated and significant efforts—had been unable to contact the Children since April 2017, that the Children had "possibly been exposed to illegal drugs as well as tuberculosis," and that the Children's maternal grandmother had "given deceptive/untrue information in an apparent attempt to prevent DCS and the court from locating the children." Ms. Easley, the Children's first caseworker, testified that she set up at-home parenting education for Mother and personally performed random drug screens on Mother. Ms. Teeters, who took over from Ms. Easley, visited Mother's home several times and observed "a constant string of multiple adults" coming

---

[5] The trial court had previously adjudicated the Children to be dependent and neglected by Mother due to lack of supervision and prescription drug abuse in an agreed order entered on April 15, 2015. At that time, however, the Children were not placed in the custody of the Department.

in and out each time she visited. She was not able to obtain from Mother any confirming information on the identity of these individuals. Ms. Teeters also arranged for and followed up with Mother to complete an alcohol and drug assessment. We find, as did the trial court, that the Department made reasonable efforts to assist Mother with establishing a suitable home following removal of the Children. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

Mother argues that she made reciprocal reasonable efforts to provide a suitable home for the Children during the four months immediately following their removal in August 2017. *Id.* We agree. Ms. Easley stated that Mother had stable housing and participated in treatment for her substance abuse issues through BHG during the months of August to December 2017. Mother completed specific repairs to the home identified by the Department as necessary to make the home a safe place for the Children. She also completed a parenting assessment in December 2017. These actions of Mother show reasonable efforts to address her drug use and make her home physically safe for the Children immediately following removal. However, our inquiry does not end there. The statutory four-month period during which the Department must make reasonable efforts and the parent reciprocate them is not limited to the four months immediately following removal. *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (stating that "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal"). Although we recognize that Mother initially made efforts to provide a suitable home, when considering the entire post-removal period, we find that she "demonstrated a lack of concern for the [Children] to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the [Children] at an early date." *Id.*

Establishing a suitable home involves more than providing a safe physical space. Here, Mother was specifically required to make reciprocal reasonable efforts to provide appropriate care and a drug-free home for the Children. *See In re Matthew T.*, 2016 WL 1621076, at *7; *In re Hannah H.*, 2014 WL 2587397, at *9. While DCS engaged with Mother during the entirety of the custodial period to assist her with addressing and meeting the Children's educational and psychological needs, Mother made little to no effort in these areas. Paramount to our analysis here is the testimony of caseworkers and foster parents alike that Mother was not involved in COE meetings concerning the Children's counseling needs, nor was she involved in IEP sessions addressing the Children's academic needs. In addition, Ms. Easley and Ms. Teeters both testified that Mother had a pattern of inconsistency, disappearing for weeks at a time. We also cannot ignore that—despite Mother's early efforts—her drug use resulted in the trial court suspending her visits with the Children. Against this backdrop, we conclude that the trial court did not err in concluding that this ground for termination was proven by clear and convincing evidence.

## B. Substantial Noncompliance with Permanency Plan

Tennessee Code Annotated section 36-1-113(g) provides that parental rights may also be terminated on the ground of "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground cannot be established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *accord* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

Here, the trial court ratified an initial permanency plan in January 2018, finding the plan's requirements reasonable and in the best interests of the Children. The plan required Mother to complete and follow recommendations of alcohol and drug, mental health, and parenting assessments, respectively; submit to random drug screens; obtain and maintain income to support the Children; obtain and maintain stable housing; maintain supervised visitation with the Children; and maintain regular contact with DCS. We find that these requirements sufficiently relate to the issues prompting the children's initial removal— Mother's substance abuse and supervision of the Children.

DCS proved by clear and convincing evidence that Mother's noncompliance with her responsibilities under the permanency plan was substantial. Ms. Easley testified that Mother was mostly compliant with the permanency plan until about December 2017.

Mother completed a parenting assessment that month, and Ms. Easley arranged for Mother for parenting classes at Mother's home. However, the classes were terminated after Mother became noncompliant. Ms. Easley administered a drug screen after learning that the ones given by BHG were not random, and Mother tested positive for marijuana. Ms. Teeters testified that in August 2018, she began discussing with Mother the importance of fulfilling her responsibilities under the permanency plan to maintain her parental rights. According to Ms. Teeters, Mother admitted to using drugs during Christmas 2018 and tested positive for amphetamines and methamphetamines in January 2019. She also tested positive for cocaine in July 2019. Mother's visitation with the Children was suspended in August 2019, after the drug screen given at Jordan's game in March 2019 was positive for methamphetamine and alcohol. Mother had the opportunity to resume visitation by obtaining alcohol and drug and mental health assessments, but she had not so done by the time Ms. Teeters was off the case in October 2019. Although Mother disputed at trial the results of the March and July positive drug screens, without any corroborating evidence, we must defer to the trial court's implicit resolution of credibility issues in favor of the Department's witnesses. *See T.M.B.K.*, 197 S.W.3d at 288.

The proof also establishes that Mother did not fulfill her obligation to support the Children. In addition to being gainfully employed since March or April 2019 and working two jobs since the summer of 2019, Mother affirmed she receives social security survivor's benefits of approximately $400 per month. Yet, by the time of trial in February 2020, she had made child support payments only for about eight weeks in the summer of 2019. No explanation was given for the lack of support. Both Ms. N. and Ms. T. testified that Mother sent gifts to the Children from time to time, but the gifts often included clothing and shoes in incorrect sizes and items not age-appropriate for seven-year-old Jayce.

Mother appears to have complied with the permanency plan for a handful of months immediately after the Children were removed from her custody. Thereafter, however, Mother did not comply with the plan's requirements with respect to drug use, support of the Children, various assessments, and visitation. We affirm the trial court's conclusion that DCS proved this ground for termination by clear and convincing evidence.

### C.     Failure to Remedy Persistent Conditions

Tennessee Code Annotated section 36-1-113(g) explains that a person's parental rights can be terminated when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A). The purpose of the persistence of conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

The Children were removed from Mother's custody in August 2017, more than six months before DCS filed the petition to terminate her parental rights in June 2019. The removal was based upon concerns of drug exposure and parenting issues stemming from Mother's drug use. Mother's substance abuse issues persist. The record shows that DCS was involved with the Children as far back as August 2014 because of Mother's drug use. Three years later, in August 2017, the trial court placed the Children in the Department's custody following a referral that Mother had exposed the Children to drugs. Sadly, Jordan tested positive for marijuana at that time. In 2019, Mother tested positive for drug use in January, March, and July. Likewise, Mother's parenting and supervision issues remain unresolved. Although Mother has resided in the same home for a number of years and made repairs to make the home safe, her own actions prevented her from making progress with visitation and eventually led the trial court to suspend visitation altogether. Ms. Easley explained that Mother's lack of success with completing parenting training impacted the Department's ability to change visits to the Children from supervised to unsupervised. Ms. Teeters noted that DCS was concerned with Mother's ability to supervise the Children given her drug use.

In August 2019, at the request of the Children's guardian ad litem, the trial court suspended Mother's visitation and telephonic communication with the Children. The suspension followed an incident in which Mother showed up more than one hour late to Jordan's basketball championship game, was under the influence of drugs, refused to submit to a drug screen, and eventually tested positive for ethanol and methamphetamines. This incident is indicative not only of Mother's lingering drug use after the Children were removed from her custody, but also of the impact that her drug use has on her ability to parent and supervise the Children. Moreover, Mother's failure to obtain the alcohol and drug and mental health assessments that would allow her to regain visitation with the Children illustrate a persisting inability to parent.

We conclude, as the trial court did, that the conditions that caused the Children's removal persist and that there is little likelihood that they will change any time soon—given their unabated presence for over five years and Mother's lack of consistent progress. We also find that these conditions hamper the Children's stability. Jayce's mental health counselor expressly recommended against telephone calls between Jayce and Mother to avoid possible setbacks in Jayce's progress. Both caseworkers and foster parents testified that the Children are stable and doing the best they have ever done in their current placements. We see no reason to disturb that dynamic. The trial court correctly determined that this ground for termination was proven by clear and convincing evidence.

### D.     Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Tenn. Code Ann. § 36-1-113(g)(14). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* As to the first element, our Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set forth in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018). *See In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10,

2020) (citing *In re Amynn K.*, 2018 WL 3058280, at \*13). That is, that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Here, the proof establishes that Mother failed to manifest both an ability and a willingness to assume custody and financial responsibility of the Children. Although Mother was receiving survivor's benefits and obtained gainful employment in early 2019, by the time of trial she had provided financial support for only a few weeks. We do not view the gifts she sent from time to time as evidencing a willingness to assume financial responsibility of the Children. Rather, we find that Mother was able but unwilling to assume financial responsibility of the Children. In the same vein, we find that Mother's failure to take the steps necessary to regain the ability to visit the Children after the trial court suspended visitation indicates a lack of willingness to assume custody. Moreover, Mother's unsupported assertions that her positive drug screens were incorrect cast doubt on her willingness to take responsibility for her actions, including parenting the Children.

Nor are we persuaded that Mother has the ability to assume custody of the Children. Although very early in the custodial period Mother completed an alcohol and drug assessment and made physical repairs to her home, she has continued to struggle with drug use, has been unable to progress from supervised to unsupervised visitation, and has failed to financially support the Children. As Ms. Teeters aptly stated, "the reality is we're sitting here at two-and-a-half years, and it's just this long, drawn out story of ups and downs and not being able to show that sobriety and stability long term." Mother asks this Court to look at the potential for future improvement, but we must consider whether she has manifested an ability through her actions (or omissions) prior to termination to assume custody and financial responsibility of the Children. We conclude she has not.

Based on these findings, we also conclude that returning the Children to Mother's custody would place them at risk of "substantial harm to the[ir] physical or psychological welfare." The Children have been the most stable they have been in their current placements. Ms. Pendergrass—Jayce's mental health counselor and Mother's own witness—did not think that having contact with Mother would be "the most positive thing [for Jayce,] in the sense that it sort of puts her in a roller-coaster of thinking that she's going to immediately go to her mom's." Indeed, Ms. Pendergrass recommended that Jayce stays where she is if possible, and Jayce has told her the same. We agree with the trial court that DCS also proved this ground by clear and convincing evidence.

## II. Best interests of the children

In addition to proving at least one statutory ground for termination, a party seeking

to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tennessee Code Annotated section 36-1-113(i) provides nine factors for analyzing best interests:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would

be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In its final order, the trial court set forth the facts relevant to analysis of each of the nine statutory factors and concluded that terminating Mother's parental rights was in the best interests of the Children. Mother argues that the evidence preponderates against the trial court's conclusion. We disagree.

We acknowledge that Mother lived consistently in the same home and had, by the time of trial, maintained regular employment for over a year. However, as the trial court noted, her drug use issues persist. The record reflects that Mother tested positive for various substances several times after the Children were removed from her custody. In addition, she did not complete the parenting training recommended after her parenting assessment as required under the permanency plan. The record also documents the efforts made by DCS and other social services agencies to assist Mother in overcoming her challenges. Under these circumstances, the trial court did not err in finding that Mother's circumstances and conduct had not improved so as to make it safe for the Children to live with her and that lasting adjustment does not reasonably appear possible. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(2).

As to regular visitation with the Children, *see id.* § 36-1-113(i)(3), Mother asserts that she did so "regularly . . . until her visitation was suspended." However, we cannot overlook the fact that her supervised visitations never progressed to unsupervised and were ultimately suspended as a result of Mother's own actions—her failure to complete tasks required under the permanency plan and her unabated drug use. Moreover, Ms. Teeters testified that Mother could have regained visitation by obtaining alcohol and drug and mental health assessments as outlined in the permanency plan but did not. This factor also weighs against Mother.

As the trial court noted, we find that the proof shows a bond between Mother and

the Children. *See id.* § 36-1-113(i)(4). Both Children spent the majority of their lives in Mother's custody; they were not placed with the Department until August 2017 at the ages of eleven and five, respectively. Further, the case workers testified that Jayce continued to hope, at least until recently, that she would return to Mother's care. The trial court questioned, however, whether a "long-lasting" relationship could continue between Mother and Children given that that the Children have now been in foster care for more than two years and that Mother has been unable to visit them due to her own actions. Ultimately, we find that this factor is not determinative. However, we have little trouble concluding that removing the Children from their respective foster homes is likely to be detrimental to them. *See id.* § 36-1-113(i)(5). Ms. Teeters testified that she observed Mother being unable to achieve stability by making progress and then falling off. Ms. Easley described Mother's pattern of disappearing for a couple of weeks. Ms. Pendergrass, Jayce's mental health counselor, recommend against phone calls with Mother. In contrast, both caseworkers and Ms. Pendergrass observed that the Children are stable and adjusting well in their foster homes and that it would be best for them to remain in their placements and be adopted. Jordan and Jayce's foster parents corroborated the progress the Children have made under their care. We find that the lack of stability Mother has demonstrated would not serve the best interests of the Children as they continue to navigate needed services for their emotional, physical, and academic well-being.

In this case, the Children's exposure to drugs is the primary evidence of physical abuse and neglect by Mother. *See id.* § 36-1-113(i)(6). We agree with the trial court that Mother has not been able to resolve this issue. Mother tested positive for drug use several times after these termination proceedings began and such use clearly appears to impact her ability to provide proper care for the Children. *See id.* § 36-1-113(i)(7). Mother has been unable to complete the prescribed parenting training because of her own noncompliance. All of these issues cast serious doubts on her ability to provide "safe and stable care and supervision." *Id.* § 36-1-113(i)(8). As to child support payments, *see id.* § 36-1-113(i)(9), we have already noted Mother's shortfalls. Mother offered no explanation for her failure to provide support in accordance with DCS guidelines. Based on the above, the trial court correctly found that terminating Mother's parental rights is in the Children's best interests.

## CONCLUSION

We affirm the judgment of the Davidson County Juvenile Court and tax the costs of this appeal to the Appellant, Amber S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE